## No. 8634.

## NORTH BOULDER FARMERS' DITCH CO. ET AL. *v.* LEGGETT DITCH & RESERVOIR CO.

1. WATER RIGHTS—*Adjudication of Priorities—Construction of Decree.* The consumers' Statements of Claims, as well as the attending circumstances, are considered, in the construction of the decree, where it presents any ambiguity.

2. *Decree Construed.* In 1862 a number of the settlers upon Boulder Creek took possession of a channel thereof known as Dry Creek, cleared it out, and converted it into a channel for conveying water to their plantations. Some of these took out a ditch from this channel, below the others, and became incorporated as the North Boulder Ditch Company. In 1874 this company granted to the White Rock Ditch Company a right of way over this channel to the point where the ditch of the North Boulder Company diverged therefrom, with the right to convey water therein, to supply the ditch of the White Rock Company, and the latter company agreed to supply to the North Boulder Company's ditch all water which said ditch would carry in its then condition, or according to its increased capacity by any subsequent enlargement. In 1882 by a decree entered in adjudication proceedings a priority No. 11 of June 1, 1862, was awarded for divers volumes of water to certain separate appropriators using the Dry Creek channel, including the North Boulder Company. Other appropriations of later date were also awarded to this company aggregating a considerably greater volume that then, or at any time afterwards, it applied to any beneficial use. The White Rock Company was awarded priority No. 35 as of November 1, 1873.

   In 1911 the White Rock Company asserted a claim under the contract of 1874, to all the water decreed to the North Boulder Company in excess of what had been beneficially applied by that company, and in an action brought by an appropriator senior to the White Rock Company, to declare an abandonment by the North Boulder Company, of this water, the White Rock Company contended that the entire award of waters conveyed through the Dry Creek Channel was to that company, that it should be treated both as a carrier and a user, and that the other ditches taking water from the Dry Creek channel should be regarded as mere laterals, and parts of the same unit. Considering that the contract made between the North Boulder Company and the White Rock Company, 1874, did not purport to affect the other appropriators, to whom

the adjudication decree had awarded separate and distinct amounts, or in any manner to treat of their rights, that in the adjudication proceedings the North Boulder Company and the White Rock Company filed separate claims, and that the White Rock Company, though its statement of claim was filed many years subsequent to the date of the contract, made no claim to an appropriation as of any date earlier than 1873, this contention was repelled.

3. *Abandonment.* An irrigating company had for twenty-nine years permitted a portion of the waters awarded to it in adjudication proceedings, to remain in the stream, and pass to other consumers, never manifesting any intention to resume this excess, or apply it to beneficial uses, *held* a clear case of abandonment.

4. *Effect of Abandonment.* The abandoned waters become part of the stream and are to be taken by other appropriators according to their respective priorities.

5. CONTRACTS—*Construction.* Where the language of a contract is ambiguous the conduct of the parties acting under it, before controversy arises, is one of the most reliable tests of their intention.

6. *Construed.* In 1874 the North Boulder Company granted to the White Rock Company a right of way over a certain line of ditch, with the right to convey water therein, and the White Rock Company agreed to supply to the North Boulder Company all water which its ditch would carry, in its then condition, or as it might afterwards be enlarged. In 1882 by a decree entered in adjudication proceedings the North Boulder Company was awarded several volumes of water of different priorities, considerably exceeding what it at any time, then or afterwards, beneficially applied. In an action brought by an appropriator senior to the White Rock Company, to declare a forfeiture by the North Boulder Company of the water so decreed to it and never beneficially applied, the White Rock Company claimed that the effect of the contract of 1874 was to transfer to it all the waters so decreed to the North Boulder Company, and which had never been applied by that company to beneficial uses. Considering that in the adjudication proceedings the White Rock Company asserted no claim under the contract of 1874, that no such claim was ever asserted until 1911, and that in the intervening years, up to 1882, the North Boulder Company had from time to time increased the volume which it diverted, and the acreage which it watered, this contention was rejected.

7. APPEAL AND ERROR—*Harmless Error.* Upon bill by consumer to declare abandoned a volume of water decreed to a senior appropriator, the District Court assumed to revise the original decree, entered in the adjudication proceedings, and correct certain supposed mistakes in computation, as to the volumes awarded to the senior appropriator. The court having decreed correctly as to the volume which had been beneficially applied, and to which no claim of abandonment could justly be asserted, *held* that the attempted revision of the original decree was immaterial and harmless, even if erroneous.

8. PARTIES—*Necessary Parties.* Bill by an irrigation company to declare abandoned water awarded in adjudication proceedings to a senior appropriator. Other consumers diverting water from the same stream, by the same diversion works and channel, having no interest in the controversy, and for or from whom nothing is claimed, are not necessary parties.

Nor are other consumer ditch companies in this district, though entitled to share in the alleged abandonment. *Affolter v. Rough & Ready Co.*, 60 Colo. 519, followed.

Nor individual consumers under the ditch against which abandonment is alleged, nor the consumers under another claiming to have succeeded to its rights.

9. TRIAL—*By the Court—Evidence.* In trials by the court the rules as to the admissibility of evidence are not so rigid as in trials before a jury.

10. COSTS—*Apportionment.* Bill by an irrigation company to declare abandoned a volume of water awarded in adjudication proceedings to a senior appropriator. The plaintiff prevailing as to the greater part of its claim, as to the volume abandoned, *held* there was no abuse of discretion in taxing all costs against the defendant.

*Error to Boulder District Court, Hon. Robert G. Strong, Judge.*

Messrs. TEDROW & FITZGERALD, for plaintiffs in error.

Mr. F. S. LUETHI, for defendant in error.

Mr. Justice Hill delivered the opinion of the court:

THIS action was brought by The Leggett Ditch and Reservoir Company against The North Boulder Farmers'

Ditch Company, The Boulder and White Rock Ditch Company and certain water officials. The objects were: First, to have the original decree for the waters in Boulder Creek in District No. 6, Division No. 1, bearing date June 2, 1882, corrected in certain particulars wherein it is alleged there are manifest clerical and arithmetical errors. Second, to have all waters awarded to The North Boulder Farmers' Ditch Company's ditch by virtue of said decree, in excess of twenty second feet, declared abandoned, etc. And third, to have defendants enjoined from diverting or using any waters from Boulder Creek on account of Priorities Nos. 11, 20 and 24 awarded to The North Boulder Farmers' Ditch Company's ditch, in excess of twenty cubic feet of water per second of time, etc. The findings and decree were in favor of the plaintiff, the defendant in error here. They include a finding that, since the entry of said decree in 1882, all the water thereby awarded to The North Boulder Farmers' Ditch Company's ditch in excess of forty-eight cubic feet per second of time has been wholly disused and abandoned.

There are fifty-seven assignments of error. For the purposes of argument, counsel have arranged them in seven groups, the most important of which is the one bearing upon the contention that the testimony is insufficient to support the finding of abandonment. For convenience we will refer to The North Boulder Farmers' Ditch Company as The Boulder Company, and its ditch as The Boulder Ditch, to The White Rock Ditch Company as The White Rock Company, and its ditch as The White Rock Ditch, and to The Leggett Ditch and Reservoir Company as The Leggett Company and to its ditch as The Leggett Ditch.

The record discloses that Boulder Creek in its course through the City of Boulder crosses Twelfth Street, which is carried over the stream by a bridge known as the Twelfth Street bridge; that just below this bridge is a diverting dam and headgate, through which water is taken from the creek into a common channel used by eight or nine different ditches; that this channel is usually referred to as Dry

Creek; that it runs nearly due east, and that any considerable amount of water running into it from Boulder Creek in its natural state would rejoin the creek about three miles below Twelfth Street; that this channel may have been once the main channel of the creek; that the pioneers differ in remembering whether, when the white man first came, this channel 'was dry, or carried a part of the flow of the creek, but all agree that it carried waters in time of floods. In *Boulder Ditch Company v. Hoover*, 48 Colo. 343, 110 Pac. 75, referring to this channel it is said:

"The evidence shows that the original Dry Creek ditch was built by D. H. Nichols, in the early sixties, and that the original channel and diverting works were enlarged, from time to time, upon the construction of other ditches."

Plaintiffs in error claim that the organizers of The Boulder Company were the first who employed this means of carrying any considerable amount of water, and for that reason they were exercising virtually a proprietorship over the water course, and the water in it, in the year 1874. The question is immaterial. It is agreed that prior to 1862 this natural water course was in existence. The court found that it was formerly a division or branch of Boulder Creek. The record discloses that in 1862 a number of farmers owning land adjacent to it constructed a channel in it, and the first headgate at the Twelfth Street bridge, whereby they diverted water from Boulder Creek into Dry Creek, and at convenient places took it out of this channel by constructing ditches therefrom; that a number of farmers owning land north and east of Dry Creek participated in the original construction, or soon thereafter enlarged it, constructing a ditch therefrom at a point lower down than the others, naming it The North Boulder Farmers' Ditch, and that in 1863, and again in 1864, this ditch was enlarged, and in 1871 those interested in it incorporated under the name of The North Boulder Farmers' Ditch Company; that in 1874 The White Rock Ditch, then known as The Beasley Ditch, was constructed, having its headgate at the same point as the others on Dry Creek, utilizing it as the conduit for its

water, from the headgate at Twelfth Street to Twenty-first Street in the City of Boulder, a distance of about seven hundred yards, where its ditch diverges to the north from Dry Creek; that in the same year The Boulder and Left Hand Ditch was constructed, using the same headgate to what is called "The Wye", where it diverges to the northeast, parallel to The Boulder Ditch; that on May 23, 1874, a contract was entered into between The Boulder Company and The White Rock Company, which states:

"That whereas both the said companies have filed certificates of incorporation covering the right of way upon the same line from the point of commencement in the North Bank of Boulder Creek in the Town of Boulder in said Boulder County, near the bridge over said Boulder creek at the foot of Twelfth Street in said Town, to Lot Nine in Block "D" of the Town of East Boulder, where said ditches diverge,

And Whereas the said North Boulder Farmers' Ditch Company has the oldest charter privileges to that portion of said line; Now therefore in consideration of the agreements herein entered into on the part of Boulder & White Rock Ditch Company, the North Boulder Farmers' Ditch Company hereby agree that said Boulder and White Rock Ditch Company shall have the right of way over that portion of their line, and to carry the water from Boulder Creek over said line to supply its said ditch, in the following terms and conditions, that is to say:

FIRST.   The said Boulder & White Rock Ditch Company shall make, keep up and maintain a good and sufficient headgate at its point of commencement where the water is taken out of Boulder Creek and diverted into said ditch, for the use and supply of both said ditches:

SECOND.   Said Boulder & White Rock Ditch Company shall make and maintain a good and sufficient headgate on said Lot Nine in Block "D", where its said ditch diverges from the North Boulder Farmers' Ditch, for the purpose of supplying the last named ditch with water from the outlet to be opened or enlarged and improved by said Boulder &

White Rock Ditch Company, from Boulder Creek to the point of divergence of said ditches.

THIRD. Said Boulder & White Rock Ditch Company shall open an outlet as above described from Boulder Creek to said point of divergence, of sufficient capacity to supply the North Boulder Farmers' Ditch Company's ditch with all the water it will carry in its present condition in addition to the supply of water for the Boulder & White Rock Ditch.

FOURTH. The said Boulder & White Rock Ditch Company shall supply the said ditch owned by the North Boulder Farmers' Ditch Company with all the water their said ditch will carry in its present condition, when desired by the latter company so to do; and if said latter company shall elect to enlarge its said ditch at any time and shall at its own expense enlarge its said outlet in the same proportion to the enlargement of its ditch, so that the increased capacity of said outlet to carry and supply water shall be equal to the increased capacity of said North Boulder Farmers' Ditch to convey such water, then the Boulder & White Rock Ditch Company shall supply water equal in quantity to the increased capacity of said North Boulder Farmers' Ditch, and shall continue thereafter to supply said last named ditch with all it will so carry when so requested by the officers of said last named ditch company.

On the terms and conditions aforesaid the said North Boulder Farmers' Ditch Company do hereby give, grant, bargain and sell unto said Boulder & White Rock Ditch Company the right of way from the said joint point of intersection of said ditches with Boulder Creek in said Town of Boulder to the point of divergence of said ditches on Lot Nine in Block "D", in the Town of East Boulder, together with the right to convey water thereon for the purposes aforesaid, and also the exclusive right to all the water so conveyed over said line except sufficient thereof to supply the said North Boulder Farmers' Ditch Company's ditch with water to the extent before herein stated.

And the said Boulder & White Rock Ditch Company hereby agree to the conditions above named and in considera-

tion of the right of way and water privileges above herein granted by said North Boulder Farmers' Ditch Company, on the terms and conditions aforesaid, hereby bind itself to carry out said terms and conditions."

The record further discloses that after the passage of our irrigation acts of 1879 and 1881, an adjudication proceeding was instituted thereunder in the District Court of Boulder County, to determine the priorities in this water district, which culminated in the decree of June 2, 1882, by which The White Rock Ditch was awarded Priority No. 35 from Boulder Creek by original construction as of date November 1, 1873 for 556.7 second feet for the first seven hundred yards of its ditch from the Twelfth Street headgate, and 190.58 second cubic feet for the remainder of the line of said ditch.  In this proceeding the referee further found, and the court approved such finding, that on the 1st of June, 1862, the original channel of said ditch was constructed under the name of The Dry Creek Ditch by David H. Nichols, M. G. Smith, Cole Elsbary and Charles P. Hamlin, and claiming through said original owners, and by means of the original construction of said Dry Creek Ditch, the following persons were held to be entitled to water through and by means of the headgate and the first seven hundred yards of said Boulder and White Rock Ditch, socalled, in the amounts named and of the priority of June 1, 1862, which was No. 11 on said Boulder Creek, that is to said David H. Nichols to 10 cubic feet per second of time, M. G. Smith to 15 cubic feet, G. Berkeley 15 cubic feet, Wellman Nichol and Hahn 10.77 cubic feet, the heirs of Elizabeth Hardin, George W. Rust and Perry White to 5 cubic feet, William Beech to 2 cubic feet; and the following ditch companies, to-wit, The North Boulder Farmers' Ditch Company to 10.78 cubic feet, and said ditch company, of the priority of June 1, 1863, to 65 cubic feet, being No. 20 on said creek, and of the priority of June 1, 1864 to 115 cubic feet, being No. 24 on said creek, and The Boulder and Left Hand Ditch Company, of the priority of December the 1st, 1873 to 82.8 cubic feet, being No. 36 on said creek, and

of the priority of April 1, 1876 to 163 cubic feet, being No.
38 on said creek; that in said decree, The Leggett Ditch,
which takes its supply from Boulder Creek several miles
down the stream was, by virtue of original construction,
by its predecessors in interest awarded Priority No. 30,
as of date 1868 for 31 second feet, which makes its priority
senior to that of The White Rock Company's, but junior to
those of The Boulder Company's. For this reason, the
questions which effect the Leggett Company's alleged rights,
are, the abandonment of the water decreed to The Boulder
Company's Ditch, and the right of The White Rock Ditch to
now use any of this water, it being agreed that at times
there is not sufficient to be had from this stream to supply
the needs of all.

The plaintiffs in error contend that upon account of the
physical conditions, the contract heretofore referred to be-
tween the two ditch companies, and the language of the
decree that the entire award of water to this Dry Creek
channel as of any date was to The White Rock Company
as both a carrier ditch, and a user of water, that the other
ditches supplied therefrom, as well as its, beyond the seven
hundred yard limit, taking water from the stream through
this Dry Creek channel, are nothing more than laterals;
that the trial court in dealing with it should have treated
them all as one unit, but one ditch with different dates of
priorities therefor, of different amounts, and that the court
erred in considering testimony concerning the abandonment
of water under The Boulder Company's Ditch, alone, as a
separate entity, and in refusing to consider it as a part of
but one system, bound up together for all purposes. The fal-
lacy with this argument is the false premise upon which it is
based, and the lack of testimony to support it. The con-
tract was made in 1874, the adjudication decree was rend-
ered in 1882. The contract does not purport to bind or
interfere with the rights of the seven other groups of indi-
viduals or corporations which the decree recognizes, in
about three hundred feet of water carried through this
same channel, and for which these several ditches were

awarded separate and distinct amounts. In the original adjudication, the referee's report discloses that some of these groups constructed and used this Dry Creek as a part of their ditch system, and' that others thereafter enlarged it, and had thus used it, long prior to the existence of The White Rock Company, or construction of its ditch. The record further discloses that in the adjudication proceedings plaintiffs in error filed separate statements of claim, The Boulder Company claiming the earlier priority awarded to it, viz, No. 11 by virtue of original construction in 1862, and Nos. 20 and 24 in '63 and '64 by enlargement of both the channel of the dry stream, and its ditch therefrom; that by its statements of claim, The White Rock Company claimed its priority No. 36 as of 1873 by virtue of original construction, and made no claim to any earlier water, although this statement of claim was filed some eight or nine years after the time which it now claims it acquired an interest in the earlier waters by virtue of the contract with The Boulder Company. When these statements of claim of the plaintiffs in error in the adjudication proceedings, together with the decree, and the surrounding circumstances, are considered, they are convincing of the correctness of the trial court's holdings that each of these eight or nine ditches taking their supply from Boulder Creek through this dry channel, and diverted therefrom at different places, where the remainder of each ditch leaves the common channel, were each separate and distinct entities, with priorities accordingly, and that the contract between plaintiffs in error was never intended to, and did not, change this condition of affairs between them. In determining a question of this kind where there is any ambiguity or uncertainty in the decree, this court has uniformly held that we can consider these statements of claim, the surrounding circumstances, etc. *New Mercer Ditch Co. v. Armstrong,* 21 Colo. 357, 40 Pac. 989; *Bates v. Hall,* 44 Colo. 360, 98 Pac. 3; *New Brantner Ditch Co. v. Kramer,* 57 Colo. 218, 141 Pac. 498, Ann. Cas. 1916B, 1225; *H. H. Ditch Co. v. Big Stick D. Co.,* 162 Pac. 149; *Ft. Collins M. & E. Co. v. Larimer & Weld I. Co.,* 61 Colo. 45, 156 Pac. 140.

We have carefully considered the testimony upon the question of abandonment. Eliminating what is claimed by virtue of the contract between the two companies, which will hereafter be considered, the great weight of the remainder of the testimony is to the effect that since the entry of the decree in 1882, down to the institution of this suit in 1911, a period of twenty-nine years, The Boulder Company has never been able to, and has never carried or applied to a beneficial use but a small portion of the priorities decreed it, and that the excess has always remained in the stream, and been used by junior appropriators (including the defendant in error), in the order of their respective priorities. These facts are established by the testimony of the different water commissioners during this entire period, as well as the testimony of others, it is but slightly contradicted by the witnesses of the defendant in error, and then generally only as to isolated incidents in both times and amounts. The preponderance of the testimony is to the further effect that the users of water under The Boulder Ditch had no need for this excess, and allowed it to remain in the stream, without any intention of thereafter applying it to a beneficial use; that the total acreage ever irrigated from the water adjudicated to The Boulder Ditch was about 1,500 acres, with the exception of the time in 1911 when it was attempted to be run in The White Rock Ditch, which brought about this litigation. Excluding the lands alleged to have been irrigated by waters decreed to the Boulder Ditch, under The White Rock Ditch by virtue of the contract, the most claimed by any witness for the plaintiffs in error was that two thousand two hundred acres included the maximum of the land owned by the stockholders of The Boulder Company, both above and below the ditch, and that this included several tracts under the ditch not entitled to water, as well as swamp and waste land. The preponderance of the testimony is to the further effect that during this entire twenty-nine years, by the use of forty-eight second feet or less, the consumers from The Boulder Ditch had all the waters they needed for their use, and never made

claims for any more (if for that much), and that the company had no use for a greater amount and could not, under its ditch, have applied it to a beneficial use, and never, during this long period of time, evinced any intention or desire so to do.

Counsel for plaintiffs in error concede:   First, that The Boulder Ditch has never been enlarged or extended since its original construction and enlargements of 1863 and 1864.   Second, that the amount of acreage lying under it, and irrigated therefrom, has never been increased since the adjudication proceedings, and that the acreage being irrigated at the time this suit was brought was identically the same as had always been so irrigated under it.   And third, that in no year up to the time of trial, had there ever been a crop failure under it due to lack of water.   When all of these facts are considered, we are of opinion that the trial court was justified in holding that the full measure of proof exacted to warrant the conclusion of law adopted was fully supplied.   *Green Valley Co. v. Frantz,* 54 Colo. 226, 129 Pac. 1006; *Parsons v. Fort Morgan Co.,* 56 Colo. 146, 136 Pac. 1024; *Affolter v. Rought & Ready Co.,* 60 Colo. 519, 154 Pac.738.

It is claimed that the contract of 1874 constituted a sale to The White Rock Company of all the waters to which The Boulder Company was entitled, in excess of its then carrying capacity, or in excess of any additional amount it might carry by virtue of any enlargement thereafter; that it was never thereafter enlarged, for which reason The White Rock Company became the owner of its decreed water, in excess of the forty-eight feet, and that this construction was at the time placed upon the contract by the parties to it, and has been adhered to ever since, The White Rock Company using all of said waters decreed to The Boulder Ditch in excess of the amount needed by it, which the testimony discloses did not exceed the forty-eight second feet left it. While this claim, in part, is irreconcilable and inconsistent with the one preceding it, that all these priorities were awarded to The White Rock Ditch as a carrier ditch, we will

consider it in the way presented, without regard to the former claim. The difficulty with it is likewise the lack of testimony to support it. In passing upon this question the trial court found that said contract was not placed on public record, nor was any great publicity given to its details, especially of the feature assuming to convey the excess water not desired by The Boulder Company; that neither the defendant in error nor its officers nor predecessors in interest, had any notice of that feature until after the diversion of water into The White Rock Ditch in June, 1911, of which plaintiff complains; that it was commonly understood in said community that there was a grant of a right of way to The White Rock Ditch Company over said common channel, for which it had agreed to enlarge and maintain the common headgate and channel; that thereafter said common channel became known as The Beasley or Boulder and White Rock Ditch, instead of Dry Creek as it was theretofore known; that in addition to the ditches of the parties to said contract, other ditches entitled to and using said common channel were, by the 1882 decree, awarded separate amounts under Priority No. 11 for an aggregate of 78.77 cubic feet of water per second, out of said Boulder Creek; that none of the owners of said other ditches were parties to said contract, nor were their rights referred to therein; that The Boulder Company did not, after the execution of said contract, use any less water, under its said appropriations, than theretofore, but on the contrary it thereafter continuously increased its use of water thereunder, until the entry of said decree, and applied the same to lands lying under that portion of its separate ditch below said common channel, and serveable therefrom; that The White Rock Company did not use or claim the right to use The Boulder Company water under said contract prior to the use complained of in June, 1911, nor did plaintiff, or its predecessors in interest, have any notice or knowledge of any attempted use or claim thereunder, or suffer any injury thereby prior to June, 1911; that said contract, in so far as it purports to give to defendant, The White Rock Company,

the right to all or any portion of the water of the priorities of The Boulder Company, is an unlawful attempt to make said priorities do additional or double duty, in violation of the rights of plaintiff, and of other water users in said district having priorities junior thereto.

In passing upon this question, we can eliminate counsel's argument pertaining to the effect of this contract upon account of its not being placed of record, by assuming (but without deciding), as they contend, that it was immaterial. The same disposition can be made of the question concerning its publicity, or whether The Leggett Company or its predecessors had notice of its contents, but we cannot agree to the construction that the plaintiffs in error now place upon it, or to the claim that the testimony discloses that such was intended when it was entered into, or thereafter acted upon accordingly, until this claim was made for it in June, 1911. In considering the instrument, we must take into consideration the physical conditions and the surrounding circumstances. First, that the predecessors of The Boulder Company, with others, had constructed a ditch is this channel in 1862, enlarged it in '63, and again in '64, and, as the contract concedes, had the prior right of way to this Dry Creek channel in 1874, when The White Rock Company sought to use it for its ditch; that this was years before we had any law providing for the adjudication of priority rights, and that it was not then known what rights might ever be awarded to The Boulder Company other than as might be presumed by the custom then prevailing, and the act of Congress of 1866 recognizing the rights of priority by appropriation. The contract must also be construed in the light of the time when it was entered into. After recognizing The Boulder Company's prior right to the right of way, it provides that The White Rock Company should have a right of way therein to carry its water, upon condition that it enlarge the headgate and the common channel to carry sufficient water for The Boulder Company's ditch to the extent of its then capacity, in addition to the water for The White Rock Ditch, and if in the

future The Boulder Company should enlarge its ditch and its outlet at its own expense, then The White Rock Company shall supply water equal in quantity to the increased capacity of said ditch, and shall continue to thereafter supply said last named ditch with all it will carry. When the contract is considered as a whole, with the fact that The Boulder Company had its 1862, '63 and '64 appropriations, and The White Rock Company but an incompleted ditch, the above language could mean nothing other than a reservation of space to The Boulder Ditch in the common channel, with the right to have the waters from Boulder Creek, when available, carried therein for The Boulder Ditch, sufficient to supply its earlier priorities, The White Rock Company to bear the expense of such carriage through the common channel. This position is strengthened by the clause following which provides that on these terms and conditions The Boulder Company grants and sells to The White Rock Company the right of way from the joint point of intersection of said ditch with Boulder Creek, to the point of diversion of said ditch on Lot 9 in Block D (viz. where The White Rock Ditch leaves Dry Creek channel), together with the right to carry water therein for the purpose aforesaid, and also the exclusive right to all the waters so conveyed over said line *except sufficient thereof to supply The Boulder Ditch with water to the extent hereinbefore named.* It is this latter clause that plaintiffs in error content conveyed Boulder Company water to The White Rock Company. We cannot so construe it. It is admitted by plaintiffs in error that the decree of 1882 granted to The Boulder Ditch a large amount of water in excess of its capacity or needs, but they say that this was done in favor of practically every ditch in that water district in the same decree. Be that as it may, this contract was entered into in 1874, eight years before the signing of this decree, and five to seven years before we had any law providing for such adjudications. The contract reserves to The Boulder Company all the water which its ditch would then carry, or which it might thereafter carry, when enlarged, as it re-

served the right to do, hence, looking at it from the date
when it was made, The Boulder Company reserved to itself
all the water which it had then appropriated, and the right
of carriage through the common channel for any additional
water which it might thereafter wish to appropriate. Ac-
cording to the findings of the trial court, this is the con-
struction which the parties placed upon it, and acted ac-
cordingly, from the date of its execution in 1874 up to in
June, 1911, a period of thirty-seven years. The findings on
this subject are that The Boulder Company did not, after
the execution of said contract, use any less water under
its appropriations than theretofore, but on the contrary it
thereafter continuously increased its use of water there-
under until the entry of said decree, and applied the same to
lands lying under that portion of its separate ditch below
said common channel, and serveable therefrom; that The
White Rock Company did not use or claim the right to use
The Boulder Company water, under said contract, prior to
the use complained of in June, 1911, nor did plain-
tiff or its predecessors in interest have any notice or knowl-
edge of any such attempted use, or such claim, under said
contract, or suffer any injury thereby prior to June, 1911.
The preponderance of the testimony supports this finding.
We are in accord with plaintiffs in error's citations, *Farrell
v. Garfield Co.,* 49 Colo. 159, 111 Pac. 839; *Baird v. Baird,*
48 Colo. 506, 111 Pac. 79; *Lovell v. Goss,* 45 Colo. 304, 101
Pac. 72, 22 L. R. A. (N. S.), 110, 132 Am. St. 184, to the
effect that where the language in a contract is vague or
ambiguous, the conduct of the parties and the construction
which they have put upon it while engaged in its perform-
ance, before controversy has arisen, is one of the most re-
liable tests of their intention, also the added declaration in
*Animas Co. v. Smallwood,* 23 Colo. App. 476, "that the ob-
ject of the parties at the time should be taken into consid-
eration." When these tests are applied to the case at bar,
per the court's findings, they tend to establish that the
parties to the contract never agreed to, or intended to sell
or transfer, any portion of The Boulder Company's pri-

ority to The White Rock Company, or do other than give to The White Rock Company, so far as the prior rights of The Boulder Company were concerned the right to run in this dry channel all the waters The White Rock Company could get from Boulder Creek, required for its needs, in excess of the water required by The Boulder Company to the extent of the then capacity of its ditch, or to any capacity thereafter made by virtue of its enlargement. This conclusion makes unnecessary any determination of the contention pertaining to the double duty of water, or to make this priority do additional duty.

Upon account of certain language in the original decree, it appears to have awarded to The Boulder Ditch under Priority No. 11, 10.78 cubic feet per second as of date 1862 by virtue of original construction. Under No. 20, 65 cubic feet as of date 1863, on account of first enlargement, and under No. 24, 115 cubic feet, as of date 1864 by virtue of the second enlargement making a total of 190.78 cubic feet. The court found that it clearly appears from this decree, and from the findings of the referee on which the award is based, that there are manifest clerical and arithmetical errors in said decree in this, that by the award of Priority No. 20 on account of first enlargement of 65 feet, the referee intended to and did include the total capacity of said ditch at the time of said enlargement, including Priority No. 11 for 10.78 cubic feet, awarded it on account of original construction; that by the award of 115 cubic feet on account of its second enlargement, said referee intended to and did include said Priorities Nos. 11 and 20, and that on account of said errors repeated in said decree, said decree should be revised and corrected, so that Priority No. 20 shall be for 54.22 cubic feet and said Priority No. 24 for 50 cubic feet, thus making its total for the original decree 115 cubic feet instead of 190.78, as the language in the latter part of the decree reads. Error is assigned to the court's ruling in this respect, as well as to its alleged right in the circumstances of this case to go into the question at all. These questions lose their practical effect by the holding of

the court that all waters decreed to this ditch in excess of forty-eight cubic feet per second of time had been abandoned. The present decree is to the effect that whatever amount was originally awarded, there is only forty-eight cubic feet per second of time left, hence, if the court erred in this respect (which we will not determine) it was concerning a matter which, upon account of the final ruling, became immaterial and would be but a harmless error, which could in no sense change the result. This can also be said of the motion (which was denied) to separate the causes of action alleged to have been commingled in the several counts of the complaint.

It is claimed that even though reliance was made by The Leggett Company upon abandonment by The Boulder Company and the proofs established abandonment, that there is nothing to show any subsequent appropriation by The Leggett Company of this abandoned right, as it is claimed there would have to be in order to entitle The Leggett Company to a decree of abandonment and injunctive relief against The White Rock Company to prevent it from taking the waters alleged to have been abandoned. *Cache La Poudre Irrigating Co. v. Larimer & Weld Irrigation Co.,* 25 Colo. 144, 53 Pac. 318, 71 Am. St. 123, is cited as sustaining this contention. We cannot agree that this case thus holds or has any bearing upon the question. When a priority is abandoned the waters to which it was formerly entitled revert to and remain in the stream, to be taken by other ditches in the order of their respective priorities, that is all that is asked for.

The demurrer that the complaint did not state a cause of action was properly overruled. The two and four year statutes of limitation pertaining to attacks upon decrees, have no application to cases of abandonment. The defense of laches in bringing the suit, charging abandonment, is not sustained by the testimony. The trial court held that the suit was brought immediately after The Leggett Company had knowledge that The White Rock Company made claim to, and was attempting to make use of, that portion

of The Boulder Company's decree held to have been abandoned. There is ample testimony to support this finding.

The alleged affirmative defense that there were similar clerical and arithmetical errors in The Leggett Company's decree as were alleged to exist in The Boulder Company's decree did not state a defense to the cause of action involving abandonment. If that question can be gone into, which we will not determine, and the truth of the allegation sustained, it would only establish that the decree to The Leggett Ditch was for a smaller amount than it claimed. This would not change the issue concerning abandonment; if it would tend to establish anything that was material it would be that the consumers under The Leggett Ditch, upon account of the smaller amount decreed it had more reason for having its rights protected to the smaller amount.

There is no merit in the claim that The Leggett Company is not the real party in interest. The most of this defense is argumentative. It does not allege that the water users' association, or the corporations and individuals composing it, own or have any interest in The Leggett Ditch. The claim that this association composed of a large number of owners of water rights in District No. 6 are paying the expenses of this proceeding, if true, did not constitute a defense to the action.

*Seaton Co. v. Idaho Springs Co.*, 49 Colo. 122, 111 Pac. 834, 33 L. R. A. (N. S.) 1078; *Mining Co. v. Bentley*, 10 Colo. App. 271, 50 Pac. 920.

The plaintiffs in error moved to have the owners of the other ditches using this common channel made parties. This motion was denied. We find no error in this respect. Their rights were not in controversy; nothing was claimed from them nor in their favor, and the decree does not purport to in any manner affect them. The claim that all consumers in the district should have been made parties, upon account of the question of abandonment being involved, was decided otherwise in *Affolter et al. v. Rough & Ready I. D. Co.*, 60 Colo. 519, 154 Pac. 738, that decision controls this question.

The contention that the consumers under both The Boulder and The White Rock Ditches should have been made parties is likewise not well taken.

*Sterling v. Pawnee D. E. Co.,* 42 Colo. 421, 94 Pac. 339, 15 L. R. A. (N. S.) 238; *Canal Co. v. Loutsenhizer D. Co.,* 23 Colo. 233, 48 Pac. 532; *Farmers' Independent D. Co. v. Agricultural D. Co.,* 22 Colo. 513, 45 Pac. 444, 55 Am. St. 149.

It is claimed that the language of the decree restrains The White Rock Company from using any water by virtue of Priority No. 11, that in addition to the 10.78 cubic feet awarded The Boulder Ditch by this priority, 78.77 feet were awarded to other ditches, down this channel, by this same priority; that the owners of this water were not parties to the action, for which reason that the court was without authority to make any order concerning the use of their water by The White Rock Company. We agree with this latter conclusion, but we cannot agree with the construction that counsel place upon the decree. The issues tried were the abandonment of water decreed to The Boulder Company, and the right of The White Rock Company in 1911, and thereafter, to use any portion of the water decreed to The Boulder Company, which the latter had abandoned. As we read it, the reference in the decree to Priorities Nos. 11, 20 and 24 applies only to waters awarded to The Boulder Ditch; its restraining features concerning The Boulder Company includes the following exceptions: "Subject, however, to any statutory rights to the loan or exchange, or the change of point of diversion of such water." In that portion restraining The White Rock Company, the exception reads as follows: "Except it be under and pursuant only to any statutory provisions for the loan or exchange or for the change of point of diversion of such water." It will thus be observed that this decree does not attempt to effect or change the priorities awarded in the original decree, with the exception of the amount held to have been abandoned by The Boulder Company; that as to other waters the two companies are left in the same

position they were prior to the institution of the suit, to the extent that they have the right to do anything with them, permissible by the laws of this state. The waters of the others not parties to this action evidenced by Priority No. 11 are not attempted to be interfered with.

We have considered the assignments to the reception and rejection of testimony, but think no ruling thereon reversible error; as the trial was by the court the rules of evidence are not so rigid as when the trial is by jury.

*B. & W. R. D. Co. v. L. C. D. & R. Co.,* 36 Colo. 455, 86 Pac. 101; *Washburn v. Williams,* 10 Colo. App. 153, 50 Pac. 233.

Complaint is made concerning the taxation of costs. It is claimed that because The Leggett Company plead and sought to sustain the allegation that The Boulder Company had abandoned all its priority in excess of twenty feet, but were unsuccessful in furnishing testimony to establish it for forty-eight feet, that the costs should have been apportioned accordingly. The Leggett Company sustained its claim to injunction relief, also the greater part of its claim concerning abandonment. In such circumstances, we cannot agree that there was an abuse of discretion in taxing all the costs against the losing parties.

Perceiving no prejudicial error, the judgment will be affirmed.

*Affirmed.*

Decision *en banc.*